

FILED

Oct 18 2019, 7:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Megan E. Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn Nieman-Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robert McAnalley, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 18, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-1099 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Stanley Kroh, Magistrate <br><br> Trial Court Cause No. <br> 49G03-1711-F4-44873 |

**Darden, Senior Judge.**

# Statement of the Case[1]

[1] McAnalley appeals his conviction after a jury trial of Level 4 felony unlawful possession of a firearm by a serious violent felon[2] and his guilty plea to an habitual offender enhancement.[3] We affirm.

# Issues

[2] McAnalley presents three issues, which we restate as the following questions:

> I.  Did the warrantless search of McAnalley's wife's vehicle and the seizure of the handgun found therein violate the protections afforded under the Fourth Amendment to the United States Constitution?
>
> II.  Was the search of McAnalley's wife's vehicle and seizure of the handgun found therein unreasonable under the protections afforded by article 1, section 11 of the Indiana Constitution?
>
> III.  Did the trial court commit reversible error by rejecting McAnalley's offer to stipulate to a prior conviction for a Class B felony qualifying him as a serious violent felon unable to lawfully possess a handgun, by allowing the jury to learn the name and nature of his prior conviction, and by discussing that robbery conviction in the jury instructions?

---

[1] Oral argument was held in this appeal at the Indiana Court of Appeals' courtroom on February 13, 2019. We commend counsel for their written and oral appellate advocacy which greatly aided our disposition of this appeal.

[2] Ind. Code § 35-47-4-5 (2016).

[3] Ind. Code § 35-50-2-8 (2017).

# Facts and Procedural History

[3] After midnight on November 17, 2017, in the early morning hours of November 18, 2017, McAnalley and a friend, Elgin Wilson, were in Indianapolis at the home of another friend. McAnalley's wife, Desiree, called and offered to pick up Elgin and her husband because it was cold outside. On the way home, the three were pulled over in a traffic stop near the intersection of Raymond Street and Keystone Avenue by Officer Douglas Lepsky of the Indianapolis Metropolitan Police Department (IMPD).

[4] Officer Lepsky was in a fully marked police vehicle and uniform patrolling an area that was described by him as follows:

> Uh, give or take, it's north and south–let's see, East Raymond, so–the whole area's–especially around Keystone and Raymond can be a touch and go area sometimes. We get calls on narcotic investigations around that area. And–but normally the–the actually[sic] area I stopped them has been recently pretty quiet. . . . [it could be considered a high crime area]. . .(affirming that description posed in a question).

Tr. Vol. II, pp. 15, 17.

[5] Officer Lepsky ran the license plate of the vehicle in front of him, and pulled the vehicle over after discovering that the license plate was registered to a different vehicle than the one he was following (i.e., the stop was for improper plates). The vehicle in front of him was a Chevy, but the license plate was registered for a Pontiac. He initiated the traffic stop in what he also described as a residential area by only activating his emergency lights and spotlight, but not his siren.

[6] The vehicle commenced to a "slow roll, and then eventually stopped." *Id.* at 6. Officer Lepsky testified that as he observed the vehicle come to a stop, he saw the front-seat passenger, later identified as McAnalley, "leaning forward towards the dashboard." *Id.* at 74. The officer characterized those actions as a "furtive movement." *Id.* at 77. The State later used that same terminology in closing and rebuttal closing argument at trial; (furtive gestures when defendant leaned toward the dashboard where the glove box would be) *Id.* at 198-99; (furtive gestures when defendant moved toward the glove box before officer approached car) *Id.* at 214.

[7] Officer Lepsky first approached the driver's side door of the vehicle and informed Desiree, the driver, that she had been pulled over for displaying an improper license plate. The officer obtained verbal identification from the three occupants of the vehicle. McAnalley was in the front passenger seat and Elgin was seated in the back behind Desiree. After searching the names and birthdates provided by the three occupants of the vehicle, Officer Lepsky learned that McAnalley had an active felony warrant for his arrest. The officer was unaware of the basis for the issuance of the warrant. *Id.* at 14.

[8] Other officers were summoned to the scene, per normal IMPD procedure, to make the arrest on the active warrant. When Officers Matthew Coffing and Brent McDonald arrived, Officer Lepsky approached the passenger side of the vehicle, opened the door, and instructed McAnalley to step out of the vehicle. McAnalley complied, Officer Lepsky told him about the warrant, and placed

McAnalley in handcuffs. The officer then patted McAnalley down and found an empty gun holster clipped to the front waistband of his pants.

[9] Next, the officers had McAnalley stand, handcuffed, near the rear of the vehicle. Later Officer Lepsky instructed Desiree and Elgin to exit the Chevy. He testified that all three occupants of the vehicle were compliant. *Id.* at 13. They stood outside of the vehicle but were a slight distance from McAnalley.

[10] Officer Lepsky and Officer Coffing then performed what Officer Lepsky called a "protective sweep" of the interior of the vehicle, while Officer McDonald stood near the rear of the vehicle "keeping an eye on everybody." *Id.* at 8, 15. In further explanation of what was described as a protective sweep, Officer Lepsky testified as follows:

> All occupants were asked to exit the vehicle, and we did what's called a protective sweep where you just look around in plain view to make sure there are no guns or any weapons that could cause immediate threat or danger. . . .We did a sweep. I started on the, I believe it was the driver's side and Officer Coffing was on the passenger side. . . .[Answers affirmatively when asked:] When you're doing a protective sweep, you're just looking with your eyes to make sure that there's nothing that can be used to harm you. . . .[Answers in the negative when asked]: [W]hen you are performing a protective sweep, do you touch anything or manipulate anything with your hands? . . .

*Id.* at 8, 15, 16, 79.

[11] During the course of the protective sweep, officers looked at a glove box directly in front of the front passenger seat. The glove box in this vehicle,

however, was missing its cover. Inside the open glove box area, in plain view, the officers saw the handle and magazine of a handgun. Neither officer had observed the handgun when they first removed McAnalley from the vehicle. *Id.* at 16.

[12]   More specifically, the following testimony was offered by Officer Lepsky about the condition of the glove box, what was discovered, and what ensued.

> Uh, we discovered that there was a–a glove box missing the front cover, and in plain view when you just looked at that glove box, you could see a handle and a magazine of a handgun. . . .There was no cover on the glove box. We didn't have to manipulate anything, open anything, there was no cover, no door on that glove box at that time. . . . I requested Officer Coffing, who is a gun liaison to secure the gun and do DNA swabs and fingerprints off of it. . . .Uhm, I read Miranda Rights to Mr. McAnalley off an index card I keep in my front right pocket, ma'am. . . .[Answers affirmatively to the question]: Did he indicate that he did understand his rights. . . .[Answers affirmatively to the question if he had asked about the gun found in the vehicle]. . . . He said that it was his. That he knew he did–he shouldn't have had it, but he bought it off of somebody because he needed protection for himself and his family. . . . He also admitted that he was a felon. [After stating he did not talk to the other two occupants of the vehicle in reference to the gun, Officer Lepsky testified that at that time neither one volunteered that the gun was theirs].

*Id.* at 8, 10, 12, 83, 84, 85.

[13] Officer Lepsky testified that during the protective sweep the officers found "a black pistol, semi-automatic" that was located in the glove box which was missing the front cover. *Id.* at 79.

[14] There were no outstanding warrants or incriminating information about Desiree and Elgin and they were allowed to leave the scene in the vehicle after the handgun was confiscated.

[15] Officer Coffing secured the handgun in a gun box in his patrol car. He transported the handgun to the police station because he did not want to process the handgun in the rain. Once at the police station and while wearing protective gloves to preserve the evidence, Officer Coffing first swabbed it for DNA in an attempt to collect fingerprints. The DNA was submitted for further testing and the findings were "a complex mixture." *Id.* at 152.[4] Fingerprint samples, which were also submitted for testing, showed there was "insufficient ridge detail" to perform a comparison. *Id.* at 144.[5]

---

[4] Shelley Crispin, the DNA Technical Leader at the Indianapolis Marion County Forensic Services Agency, or Crime Lab, explained in her testimony that "what that means is that there are four or more individuals present whose DNA profiles are present on that sample, and we only analyze samples with three profiles, two profiles, or one profile. So once we get four or higher it's complex and we do not draw any conclusions from the samples." *Id.*

[5] Crispin also testified that "The skin on the palm–palmar surface of your hand is different than the skin on the rest of your body. The skin is raised and it tends to form patterns and the ridges–we call this friction ridge skin–and the ridges do not flow continually from one side of the hand to the other." *Id.*

[16] Subsequently, the State charged McAnalley with Level 4 felony unlawful possession of a firearm by a serious violent felon and with being an habitual offender.[6] After a pre-trial hearing and briefing by the parties on McAnalley's motion to suppress the handgun, the trial court denied the motion.

[17] McAnalley's motion to suppress stated in pertinent part as follows:

> 1. Following a traffic stop, officers of the Indianapolis Metropolitan Police Department conducted a search of the vehicle in which Mr. McAnalley was a passenger;
>
> 2. That the actions of the Indianapolis Metropolitan Police Department amounted to an illegal search of the vehicle;
>
> 3. That the search amounted to an illegal search, in violation of Mr. McAnalley's rights as protected by the Fourth and Fourteenth Amendment to the United States Constitution and by Article I, Section 11 of the Indiana Constitution. Therefore, any evidence seized as a result of that illegal search should be suppressed and excluded from evidence at trial in this matter.

Appellant's App. Vol. II, p. 87.

[18] The trial court stated in pertinent part as follows when denying the motion to suppress:

---

[6] Other charges filed against McAnalley were dismissed prior to trial and are irrelevant to this appeal.

1.  On March 27, 2018 the parties presented evidence and argument on Defendant's Motion to Suppress.  The parties filed supporting memoranda on April 2, 2018.

2.  The court has considered the officer's testimony that Defendant was the front seat passenger in a vehicle stopped due to an improper license plate.  After obtaining the identification of the driver, the Defendant, and a back seat passenger, the officer learned Defendant had an outstanding warrant in a felony case.  The officer testified he saw the Defendant lean forward in his seat in the direction of the glove box.  In a search incident to arrest for the outstanding warrant the officer discovered an empty handgun holster tucked into Defendant's waist band.  Assisting officers had the other occupants of the vehicle removed from the vehicle; the officers conducted what Officer Lepsky characterized as a protective sweep of the vehicle, in particular the front seat passenger area.  The officer testified that the glove box directly in front of the front passenger seat was missing its door or cover.  The contents of the glove box were visible without opening any compartments.  Officer Lepsky saw in the left side of the glove box what he knew to be a handgun.  The firearm was recovered.  Defendant was arrested.  The vehicle was released to the driver; driver and back seat passenger were released.  At the hearing, photographs of the firearm in the glove box were admitted as evidence.

* * * *

[Under Fourth and Fourteenth Amendment analysis the court held:] under the facts of this case the officer's brief examination of the glovebox[sic] does not run afoul of Defendant's constitutional protections when the officer is aware of the Defendant's active felony warrant, observes the Defendant make movements toward the glove box, and observes an empty firearm holster on Defendant's person.

* * * *

[Under Indiana constitutional analysis the court held:]
Considering the totality of the circumstances in this case, the court finds the police conduct to be reasonable. The initial stop was based upon an improper license plate. Upon identifying the individual in the vehicle, the officer learned Defendant had an outstanding felony warrant. Upon search incident to the arrest for the warrant the officer observed the empty firearm holster on Defendant's person. Having previously observed Defendant moving toward the glove compartment, it is reasonable for the officer to look at the glove compartment where the presence of the firearm was immediately apparent. At this time the officer was aware of the active felony warrant and therefore it would be illegal for Defendant to possess a firearm. The officer did not open any closed containers or open the glove box as the door was missing.

*Id.* at 114-17.

[19] Next, prior to trial, McAnalley filed a motion in limine. In the motion, McAnalley argued in pertinent part as follows:

OTHER CRIMES, WRONGS AND ACTS

That the facts and circumstances of this case and the nature of the present charge may require the Defendant to exercise his constitutional right to testify on his own behalf;

1. That the State and its witnesses should be ordered to refrain from mentioning any and all character evidence regarding the Defendant in the following forms: other wrongs, prior bad acts, and non-charged conduct or criminal offenses not reduced to convictions and admissible pursuant to *Ashton v. Anderson*, (1972)

258 Ind. 51, 279 N.E.2d 210 and Indiana Rule of Evidence 404 (b);

* * * *

2. That the State and its witnesses should be ordered to refrain from mentioning any and all evidence of criminal offenses and uncharged conduct of Defendant as such conduct is irrelevant, having no tendency to make the existence of any consequential fact more or less probable. Indiana Rule of Evidence 401. Irrelevant evidence is inadmissible. Indiana Rule of Evidence 101. The prejudicial effect of mentioning this uncharged conduct would substantially outweigh any probative value it may have and should be excluded. Indiana Rule of Evidence 403;

* * * *

PRIOR CONTACT WITH CRIMINAL JUSTICE SYSTEM

3. That the Defendant has prior contact with the criminal justice system. Prior contact is irrelevant, because it would have no tendency to make the existence of any consequential fact more or less probable. Indiana Rule of Evidence 401. Irrelevant evidence is inadmissible. Indiana Rule of Evidence 101. That the prejudicial effect of evidence of prior contact with the criminal justice system would substantially outweigh any probative value it may have and should be excluded. Indiana Rule of Evidence 403;

* * * *

CURRENT CONTACT WITH THE CRIMINAL JUSTICE SYSTEM

4.  That the Defendant at the time of the arrest was serving a sentence on Marion County Community Corrections.  That serving this sentence is irrelevant to the case at bar, because it would have no tendency to make the existence of any consequential fact more or less probable.  Indiana Rule of Evidence 401.  Irrelevant evidence is inadmissible.  Indiana Rule of Evidence 101.  That the prejudicial effect of evidence of current contact with the criminal justice system would substantially outweigh any probative value it may have and should be excluded.  Indiana Rule of Evidence 403;

* * * *

5.  That the Defendant had a violation filed against him from Marion County Community Corrections at the time of his arrest and an outstanding warrant.  That this violation and warrant is irrelevant, because it would have no tendency to make the existence of any consequential fact more or less probable.  Indiana Rule of Evidence 401.  Irrelevant evidence is inadmissible.  Indiana Rule of Evidence 101.  That the prejudicial effect of evidence of prior contact with the criminal justice system would substantially outweigh any probative value it may have and should be excluded.  Indiana Rule of Evidence 403;

* * * *

6.  That at the time the defendant was charged with this case, an empty gun holster was found on his person.  That the fact that he had a holster on his person should be excludedfff[sic], because it would have no tendency to make the existence of any consequential fact more or less probable.  Indiana Rule of Evidence 401.  Irrelevant evidence is inadmissible.  Indiana Rule of Evidence 101.  That the prejudicial effect of evidence of ongoing police investigations would substantially outweigh any

probative value it may have and should be excluded. Indiana Rule of Evidence 403;

* * * *

MISCELLANEOUS

7.  That the State and its witnesses should be ordered to refrain from referring to Defendant's invocation of his right not to testify as well as the exercise of his right to remain silent. U.S. Constitution, Amendments[sic]; Indiana Constitution, Article I, § §[sic] 14;

* * * *

8.  That the State should be ordered to redact any inadmissible evidence from any taped statement, photographs, or other documents which may be introduced into evidence;

* * * *

9.  That the State of Indiana and its witnesses should be ordered to refrain from presenting any expert opinions without first establishing the credibility of such witnesses as experts. Indiana Rule of Evidence 701 and 702;

* * * *

10.  That the State and its witnesses should be ordered to refrain from mentioning any prior convictions which will be used for the purpose of enhancement until a later and separate phase of the trial;

       * * * *

*Id.* at 130-33.

[20]    At the start of his jury trial, McAnalley also objected to the use of the term "serious violent felon" and to reference of the specific name of his prior crime resulting in a conviction. Tr. Vol. II, pp. 27-28. McAnalley offered to stipulate to the fact that he is a serious violent felon and requested that the jury only be informed that he was a person who could not lawfully have a gun (a practice defense counsel suggested was used in another courtroom in criminal cases in Marion County). *Id.* at 28. In response, the State agreed to remove the language using the term serious violent felon from the instruction addressing the charged crime but argued that the language about McAnalley's prior Class B felony robbery conviction was an essential element of the charged offense. *Id.* at 29.

[21]    After hearing the arguments of the parties on the motion in limine and the proposed instructions, the trial court agreed that the language referring to McAnalley as a serious violent felon should be removed from the jury instruction and ordered the State not to refer to McAnalley as such during trial. *Id.* at 32.

[22]    To provide context for the discussions regarding how the trial court chose to address McAnalley's prior robbery conviction, we reproduce Preliminary Instruction Number 4 and Preliminary Instruction Number 5, which were given over his objection.

Instruction Number 4

In this case, the State of Indiana has charged the Defendant with Count: I: Possession of a firearm in violation of I.C. 35-47-4-5, a Level 4 felony. The charge reads as follows:

Count I:

On or about November 18, 2017, Robert McAnalley having previously been convicted of Robbery, a Class B felony, in Marion Superior Court under Cause Number 49G010907FB059960 on or about April 23, 2010 did knowingly possess a firearm, to wit: a handgun.

Instruction Number 5

The crime of possession of a firearm in violation of I.C. 35-47-4-5 is defined by law as follows:

A person who knowingly or intentionally possesses a firearm after having been convicted of and sentenced for an offense enumerated under I.C[.] 35-47-4-5 commits possession of a firearm in violation of I.C[.] 35-47-4-5, a Level 4 felony.

To convict the Defendant, the State must have proven each of the following elements:

1. The Defendant, Robert McAnalley

2. Knowingly

3. Possessed a firearm, that is: a handgun

4. After the Defendant had been convicted of Robbery, a Class B felony enumerated under I.C[.] 35-47-4-5

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of possession of a firearm in violation of I.C[.] 35-37-4-5, a Level 4 felony, as charged in Count I.

Appellant's App. Vol. II, 150-51. The language of Instruction 4 follows the language of Indiana Pattern Criminal Jury Instruction 1.0700 (2016), while the language of Instruction 5 follows the language of Indiana Pattern Criminal Jury Instruction 7.2740 (2016).

[23] McAnalley had tendered a proposed jury instruction, which was rejected, but would have omitted any reference to the robbery conviction. The proposed instruction reads as follows:

Defendant is charged in Count I with the offense of Unlawful Possession of a Firearm, which is defined by statute as follows:

A person who knowingly or intentionally possesses a firearm when unable to lawfully do so commits unlawful possession of a firearm.

To convict the Defendant of Possession of a Firearm, as charged in Count I, the State must have proved each of the following beyond a reasonable doubt:

1. On or about January 18, 2018

2. the Defendant

3. knowingly or intentionally

4. possessed a firearm.

If the State fails to prove each of these elements beyond a reasonable doubt, you must find the Defendant, Robert McAnalley, not guilty of Possession of a Firearm, a Level 4 felony.

*Id.* at 141.

[24] The following discussion about McAnalley's prior robbery conviction is reflected in the record.

The State: The prior is an element of the offense and the State believes that we should be using that to prove that he's in violation of Indiana Code.

* * * *

Defense: [O]n Count I, uh, would the Court entertain the– instead of reading 'Previously been convicted of Robbery, a Class B felony,' just stating, Having been convicted of a Class B felony? And that's number four.

* * * *

The State: I think there are some B felonies that would not qualify you as SVF. I think Robbery, a Class B felony as enumerated i[n] the Indiana Code, so the fact that it's a Robbery, as a Class B felony is what makes it–what qualifies it for SVF, much like other felonies don't qualify someone as SVF. It would

just qualify them as a felon in possession within 15 years, or something like that.

* * * *

The Court: [After discussing case law and the removal of the serious violent felon terminology:] And the Court does rely on the language in Spearman[*v. State*, 744 N.E.2d 545 (Ind. Ct. App. 2001), *trans. denied*] that, you know, for–the legislature passed this law and the Court's not been presented with any specific language of a stipulation. So the Court, at this point, does intend to give the instruction fo[u]r–as it's written there. . . .Okay. Thank you. And just revisiting the issue–the primary issue we discussed earlier about the bifurcation. I did see one other case that was a[sic] Indiana Supreme Court case that–that's hinds[sic] versus State. But–and that case was a reversal and a remand, but there was a difference in that case. There was a robbery charged right at the same time as the serious violent felon. And the Court of Appeals and the Supreme Court found that–notice of the prior qualifying felony was prejudicial to the robbery charge. And here, you know, we have something different here. It's the–the Possession of a Firearm by a Serious Violent Felon charge, so the Court does see a distinction there. But the Court does direct the State not to dwell on this prior conviction, or in anyway[sic] refer to Mr. McAnalley as a serious violent felon. If during the proceeding, the defendant offers to stipulate to having the prior conviction as a B felony as a Robbery that that would be accepted. And so I think from our prior discussions you're mindful of that concern, [State]. . . . If the defense offers to stipulate to Robbery as a class B felony, that's something the Court would certainly accept. In other words, the Court is expecting the State to really not reference the prior much at all. And not have that be the focus. The focus is the possession. The element of–the prior conviction is an element and the Court believes it should be before the jury, but should not be the focus of the trial.

Tr. Vol. 3, pp. 29, 34, 35, 44, 45, 54.

[25] The State clarified for the trial court as follows:

> Uhm, and finally when I said, the question about in evidence–
> when we have the written stipulation about the prior that we
> won't illicit[sic] any information from any witnesses about it.  It
> is Mr. Barloh's intention to say Robbery, Class [B] felony, which
> disqualifies him from possession[sic] a handgun in opening.  And
> then of course, in closing we will be saying he has the Robbery
> conviction and Class B felony which disqualifies him from
> possessing a handgun.
>
> The Court:  Okay.
>
> The State:  I just wanted to clarify that, because it will be
> mentioned in opening and closing, but not in evidence, other
> than the written stipulation.
>
> The Court:  Okay.  Thank you.  And over objection, I think
> that's fair.  As the Spearman case tells us, it's an element of the
> offense, so I thin[k] you're obligated to discuss it, just not to be
> the focus, of course, the evidence.

*Id.* at 59-60.

[26] State's Exhibit 13, located in Exhibit Volume at 48, was read to the jury and reads as follows:

> STIPULATION OF FACT

> COME NOW the State of Indiana, by its deputy prosecuting attorney, and Defendant, by counsel, and hereby stipulate to the following facts for purposes of trial:
>
> 1.  That the Defendant Robert McAnalley was previously convicted of Robbery, [a] Class B Felony under cause number 49G01-0907-FB-059960 on or about April 23, 2010 which is an offense enumerated under I.C. 35-47-4-5 which disqualifies him from possessing a firearm.

*Id.* at 159.

[27] Desiree testified at trial that she was the owner of the 2007 Chevrolet Cobalt she was driving on November 18, 2017, and which was the subject of the traffic stop involving the three. She testified about her purchase of the vehicle, that she had purchased the confiscated handgun for approximately $250.00 earlier that day from a friend, and that the holster that was recovered was hers as well. She did not observe McAnalley being patted down by the officers. Therefore, she could not testify about whether the holster was recovered during the pat-down search or during the search of her vehicle. She testified that she had placed the firearm in the glove box. Desiree further testified that because they lived in "a rough neighborhood," McAnalley sometimes wore an empty holster to give the impression to others that he was carrying a gun. *Id.* at 175.

[28] Desiree additionally testified that she did not give her consent to a search of the vehicle and that she "actually protested a lot that they did not have consent to search my vehicle." *Id.* at 173.

McAnalley renewed the arguments from his motion to suppress the handgun when it was offered as evidence at trial. At the conclusion of the first phase of the bifurcated jury trial, the jury found McAnalley guilty of Level 4 felony unlawful possession of a firearm by a serious violent felon. He then admitted his status as an habitual offender.

On April 13, 2018, the trial court sentenced McAnalley to eight years in the Department of Correction for his conviction on Count I, enhanced by ten years for his habitual offender status. Additionally, he was ordered to pay a $200.00 Safe Schools Fee. McAnalley now appeals.

# Discussion

## I. Fourth Amendment

The trial court admitted the handgun into evidence at trial over his objection. McAnalley claims the trial court abused its discretion in doing so, citing Fourth Amendment jurisprudence.

Trial courts have broad discretion in ruling on the admissibility of evidence. *Dycus v. State*, 108 N.E.3d 301, 303 (Ind. 2018). A reviewing court will ordinarily disturb a trial court's admissibility rulings only where it has abused its discretion. *Id.* On review, we will find that a trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if it misapplies the law. *Id.* That said, where, as here, a constitutional violation is alleged, the proper standard of appellate review is de novo. *Id.* at 304.

[33]     The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

[34]     Our Supreme Court's opinion in *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) offers guidance regarding warrantless searches by government officials.

> Searches performed by government officials without warrants are per se unreasonable under the Fourth Amendment, subject to a 'few specifically established and well-delineated exceptions.' *Katz v. U.S.*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576, 585 (1967).  A search without a warrant requires the State to prove an exception to the warrant requirement applicable at the time of the search.  *White v. State*, 772 N.E.2d 408, 411 (Ind. 2002).

The opinion continues with a discussion of how one establishes evidence of a defendant's reasonable expectation of privacy in the location of the warrantless search.  The burden of proof is on the State to establish that a warrantless search or seizure falls within one of the exceptions.  *Justice v. State*, 765 N.E.2d 161, 164 (Ind. Ct. App. 2002).  The State, however, does not appear to contest

McAnalley's expectation of privacy in his wife's vehicle.[7] Nevertheless, even though that issue is not contested, the State still bore the burden of establishing the warrantless search or seizure fell into one of the exceptions to the warrant requirement.

[35] The State contends that the discovery of the handgun was proper because: (1) the officers' discovery of the handgun in open view did not constitute a search; and, (2) the automobile exception to the warrant requirement applies. McAnalley, however, argues that the open view doctrine does not apply to this case because Officer Lepsky opened the door of Desiree's vehicle. Further, he argues, in the alternative, that if the open view doctrine applies, the officers did not have probable cause to believe that a crime was being committed, "because there is no crime of possession of a firearm with an open warrant." Appellant's Br. at 17.

[36] The following discussion from *Justice v. State*, 765 N.E.2d 161 (Ind. Ct. App. 2002), helps distinguish terms which are important to the resolution of this issue and the evidence required to support or reverse the trial court's decision.

> The phrase 'plain view' is often used when 'open view' may be a
> more appropriate term with regard to the admissibility of
> evidence. The plain view doctrine is recognized as an exception
> to the search warrant requirement. 16 WILLIAM ANDREW
> KERR, INDIANA PRACTICE § 2.2(f)(3) at 177 (1991). The

---

[7] *See Pollard v. State*, 270 Ind. 599, 607, 388 N.E.2d 496, 503 (1979) (holding under circumstances of case not involving separation or divorce, husband has legitimate expectation of privacy in vehicle titled to spouse).

concept of 'plain view' is used when an officer is making a lawful search in a constitutionally protected area and discovers an item in plain view. *Id.*; *see also Sayre v. State*, 471 N.E.2d 708, 712 (Ind. Ct. App. 1984), *cert. denied* 475 U.S. 1027, 106 S. Ct. 1226, 89 L. Ed. 2d 336 (1986) (emphasizing that the plain view doctrine is not implicated unless a search actually occurs). Generally, items observed in plain view are not considered the product of the search. *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) (recognizing that there is no invasion of privacy when items in plain view are observed). Thus, the plain view exception is addressed to concerns implicated by the seizure of items. *Id.* at 134, 110 S. Ct. 2301.

To justify a warrantless seizure under the plain view doctrine, a law enforcement officer must not have violated the Fourth Amendment in arriving at the place where items are in plain view, the 'incriminating character' of the items must be 'immediately apparent,' and the officer must have 'a lawful right of access' to the items in plain view. *See id.* at 136-37, 110 S. Ct. 2301; *Middleton*, 714 N.E.2d at 1101. If such requirements are met, the items discovered in 'plain view' may be seized without a warrant. KERR, *supra*, § 2.2(f)(3) at 177-78.

Often confused with the plain view doctrine is the concept of 'open view,' which is used in situations in which a law enforcement officer sees contraband from an area that is not constitutionally protected, but rather is in a place where the officer is lawfully entitled to be. KERR, supra, § 2.2(e)(2) at 129; *Sayre*, 471 N.E.2d at 712. In such situations, anything that is within 'open view' may be observed without having to obtain a search warrant because making such 'open view' observations does not constitute a search in the constitutional sense. KERR, supra, § 2.2(e)(2) at 129; *see also Sayre*, 471 N.E.2d at 712. Nonetheless, in order to lawfully seize items in 'open view,' it may be necessary to obtain a search warrant or be able to justify a

warrantless seizure under an exception to the warrant requirement. KERR, supra, § 2.2(e)(2) at 129.

> To justify a warrantless seizure from an automobile, "'an officer must have probable cause to believe that the property to be seized is connected to criminal activity.'" *Id.* at 1191 (quoting *Cochran v. State*, 429 N.E.2d 672, 674 (Ind. Ct. App. 1981)); *see also Cody v. State*, 702 N.E.2d 364, 366 (Ind. Ct. App. 1998). 'Probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime.' *Taylor v. State*, 659 N.E.2d 535, 539 (Ind. 1995).

765 N.E.2d at 164-65 (footnote omitted).

[37]   Also helpful to the analysis is Indiana Code section 35-33-2-3(b) (2011). The statute provides as follows:

> (b) A law enforcement officer may break open any outer or inner door or window in order to execute an arrest warrant, if the officer is not admitted following an announcement of the officer's authority and purpose.

Here, it appears that the officer simply opened the door to ask McAnalley to exit the vehicle. There is no evidence to suggest that he was denied access to McAnalley, who was seated in the vehicle.

[38]   Further, our Supreme Court has stated the following about an officer's ability to enter a home to execute an arrest warrant without having a search warrant.

> The first issue is the requisite quality of information to support entry into a home to execute an arrest warrant without a search

warrant.  'At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'  *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961).  In recognition of this principle, the police may not enter a home by force to make a 'routine' arrest without a warrant.  *Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).  An arrest warrant founded on probable cause gives the police 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'  *Id.* at 603, 100 S. Ct. 1371.  The belief is judged on the information available to the officers at the time of entry and need not prove to have been correct in hindsight.  *United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999).  As one leading treatise summarized, it is 'generally accepted' that reason to believe 'involves something less than' probable cause.  3 Wayne R. LaFave, Search and Seizure § 6.1(a), at 265 (4th ed. 2004).

*Duran v. State*, 930 N.E.2d 10, 14-16 (Ind. 2010) (footnote omitted).  Here, although this factual situation involves an automobile, the officers were aware that they needed to immediately execute an arrest based upon an outstanding felony arrest warrant issued for McAnalley.

[39]   McAnalley contends that the automobile exception is inapplicable.  "The 'automobile exception' to the warrant requirement allows police to search a vehicle without obtaining a warrant if they have probable cause to believe evidence of a crime will be found in the vehicle."  *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010).  "[T]he exception applies to vehicles that are readily mobile and found in a non-residential area."  *Id.*  Because of the mobility of the vehicle, evidence may disappear before a warrant may be obtained.  *Id.*  Most of

the cases discussing the exception involve an arrest or an investigatory stop of a motorist that gives rise to probable cause. *Id.* McAnalley argues that there is no crime of possessing a handgun when a person has an active felony warrant for their arrest.

[40] McAnalley cites to our Supreme Court's opinion in *Pinner v. State*, 74 N.E.3d 226 (Ind. 2017) in support of his position. In *Pinner*, a cab driver observed Pinner, one of two occupants of his vehicle, drop a handgun and then pick it up again upon exiting the cab to enter Studio Movie Grill. He gave a description of Pinner and of the woman with Pinner. The driver stated that he was afraid he might be robbed although he was not actually robbed, nor did Pinner threaten the driver with the weapon. Officers responded to the dispatch and located two individuals matching the descriptions provided. Both uniformed officers flanked Pinner who was seated alone on a bench in a hallway of the theater. Pinner rocked back and forth wringing his hands, ultimately denying that he had a weapon. The officers, nonetheless, asked Pinner to stand up and keep his hands up where they could be seen. When Pinner complied, the officers observed the butt of a handgun in Pinner's front pocket.

[41] The trial court's denial of Pinner's motion to suppress evidence of his possession of a handgun without a license was reversed on appeal because the officers did not have a reasonable suspicion that criminal activity might be afoot based on the facts of that case. 74 N.E.3d at 234.

[42]     McAnalley argues that Officer Lepsky's knowledge that McAnalley had a felony warrant for his arrest did not necessarily lead to the conclusion that he could not possess a firearm under Indiana law or that such possession would lead to the inference that criminal activity was afoot. He contends that the admission of the handgun evidence at trial should be reversed along the same lines as those set forth in *Pinner*.

[43]     The State claims that the facts of this case are much different than in *Pinner*. In particular, the State highlights evidence that McAnalley leaned forward towards the dashboard area of the vehicle making furtive gestures or movements within the vehicle as observed by the officer, that he had an outstanding felony warrant for his arrest, that an empty gun holster was found clipped to the waistband of his pants and was obscured by his t-shirt, and that a handgun and magazine were observed in the glove box, which had a missing glove box cover.

[44]     The State analogizes the facts of this case with those in *Von Hauger v. State*, 255 Ind. 666, 266 N.E.2d 197 (Ind. 1971). In *Von Hauger*, at almost 4:00 a.m. the defendant stopped his conversation with another person in front of a restaurant, attempted to hide a sack containing instruments for narcotics use behind his back, and dropped the sack along the way toward his running vehicle after seeing police officers. The Supreme Court held that those actions were "some evidence of a consciousness of guilt." 255 N.E.2d at 198.

[45]    The State claims that the automobile exception applies because the handgun was not seized by the officers prior to McAnalley's admissions to them. The State points to the portions of the record where Officer Lepsky testified that after the gun was observed in the vehicle, he did not collect the gun. He approached McAnalley, read his *Miranda* warnings, and questioned him about the handgun. McAnalley admitted that the gun belonged to him and that he knew he should not have it. Officer Coffing, a certified gun liaison, waited for ten minutes until an evidence technician could arrive at the scene to photograph the gun. During that time, Officer Coffing did not touch or disturb anything in the vehicle until the technician arrived. The State argues that McAnalley's admissions after the gun was observed but before the gun was seized are strong evidence that his possession was unlawful. Therefore, the State concludes, the seizure of the handgun was justified by the automobile exception.

[46]    In this case, we conclude that the trial court correctly denied the motion to suppress, later renewed by objection to the admission of evidence at trial, reasoning that the automobile exception to the warrant requirement applies. As noted, the officer pulled over Desiree's vehicle in the early hours of November 18, 2017, due to improper plating, in an area known for a high level of crime. As her car rolled to a stop, the officer noticed that McAnalley, the front seat passenger, made furtive movements by leaning forward toward the front dashboard area. After the officer verified the identification of the three occupants of the car, he became concerned because McAnalley had an outstanding felony warrant and called for other officers to arrive at the scene.

McAnalley was told about the outstanding felony warrant and was placed in handcuffs after he stepped out of the car. He was patted down and the officer found an empty holster clipped to the waistband of his pants. During a protective sweep of the car, officers observed the handgun in the glove compartment area of the vehicle. Prior to seizing the weapon, Desiree and Elgin were asked to exit the vehicle. After McAnalley was *Mirandized*, he admitted that the gun was his and that he should not have it.

[47] We agree that there is no crime for possession of a handgun by a person with an outstanding felony warrant. Here, however, the handgun was found under suspicious circumstances, and was seized only after McAnalley admitted ownership and that he should not possess it. Neither Desiree nor Elgin was arrested after the traffic stop for improper plates. Apparently, the evidence is in dispute as to whether Desiree protested against the search and that she had purchased the handgun on the day of the incident and that it belonged to her. Either of them could have driven the vehicle away. Indeed, after McAnalley's admission to possession of the handgun and after the gun was seized and photographic evidence was documented, Desiree was allowed to leave with Elgin in her car. We conclude that there was no violation of Fourth Amendment protections.[8]

---

[8] An alternative reason supporting the search and seizure of the handgun was set forth by the trial court as a search incident to arrest. In *New York v. Belton*, 453 U.S. 454, 460 (1981), the United States Supreme Court held that when a police officer has made a lawful custodial arrest of the occupant of a vehicle, the officer may

# II.  Indiana Constitution

[48]   The Indiana Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Article 1, § 11.

> Although the wording of Section 11 is almost identical to that of the Fourth Amendment, our State Constitution's search and seizure clause is given an independent interpretation and application.  *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005).  In fact, Indiana's Constitution sometimes offers broader protections than those offered by the U.S. Constitution.  *Conley v. State*, 972 N.E.2d 864, 879 (Ind. 2012).  Amongst those broader protections offered by our State Constitution is the requirement that, prior to obtaining consent to a search, police must explicitly advise a person in custody of her right to consult with counsel.  It is unique to Indiana and has no federal counterpart.  *See United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994) ('A person in custody has no federal constitutional right to consult with an attorney before consenting to a search of his property.  However, the Indiana [C]onstitution does afford such a right.').

---

as a contemporaneous incident of that arrest, search the passenger compartment of the vehicle.  However, in *Arizona v. Gant*, 556 U.S. 322, 351 (2009), the United States Supreme Court held that a police officer may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.

*Dycus*, 108 N.E.3d at 304.

[49] Regarding a challenge under the Indiana Constitution for a search of an apartment, our Supreme Court stated that upon review we focus on the actions of the police officer instead of the defendant's reasonable expectation of privacy. *Duran*, 930 N.E.2d at 17. On appellate review, we look to the totality of the circumstances to evaluate the reasonableness of the officer's actions. *Id.* The State bears the burden of showing that the intrusion was reasonable. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004).

[50] "As we consider reasonableness based upon the particular facts of each case, we also give Article I, section 11 a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy." *Rush v. State*, 881 N.E.2d 46, 52 (Ind. Ct. App. 2008). Our Supreme Court explained in *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) as follows:

> In sum, although we recognize there may well be other relevant considerations under the circumstances, we have explained reasonableness of a search or seizure as turning on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.

[51] McAnalley argues under the first consideration that because Officer Lepsky did not know the specifics of the felony arrest warrant, there was no evidence in the record to indicate that McAnalley had committed any other crimes justifying a search of the vehicle for additional evidence. *See Chest v. State*, 922 N.E.2d 621,

624 (Ind. Ct. App. 2009). The State contends that Officer Lepsky had a high degree of concern that a violation of the law had occurred after observing McAnalley lean forward in his seat toward the glove box area; the location and time of day/night of the occurrence of the traffic stop was a high crime area; McAnalley had a felony warrant for his arrest; McAnalley had an empty gun holster clipped to the waistband of his pants that was obscured by his shirt; he observed a handgun and magazine wedged in the glove box; and, McAnalley confessed that the gun belonged to him and he knew he should not have it. The State concludes that the totality of the circumstances gives rise to probable cause that the vehicle contained evidence of a crime (carrying a handgun without a license). In reply, McAnalley argues that Indiana Constitution, article 1, section 32 protects the right to bear arms.

[52] Regarding the degree of intrusion, caselaw establishes that it is evaluated from the defendant's point of view. *Duran*, 930 N.E.2d at 18. McAnalley reiterates that he had an expectation of privacy in his wife's car. He claims that it was a moderate intrusion, Appellant's Br. at 27, because Officer Lepsky opened the door and looked inside, and Officer Coffing later seized the handgun. This took place at night and "limited public exposure and embarrassment." *Id.* (citing *Chest*, 922 N.E.2d at 624).

[53] In terms of law enforcement needs, the State contends that those needs were high once they observed the firearm in the car. McAnalley, on the other hand, argues that following *State v. Moore*, 796 N.E.2d 764 (Ind. Ct. App. 2003), *trans. denied*, the law enforcement officers' safety concerns did not support a search.

In *Moore*, officers observed a vehicle they believed was out of place in that neighborhood. After completing a traffic stop for failure to signal a turn, the officers placed Moore, the driver, under arrest for operating a vehicle while his license was suspended and had a previous violation of that suspension. His two passengers were also asked to exit the vehicle. During a subsequent total search of that vehicle, officers discovered a .38 caliber handgun under the driver's seat. Moore admitted that the gun was his.

[54] On appeal, resolving an argument under Indiana Constitutional analysis, a panel of this Court stated the following:

> On one hand, we have a police officer who is conducting a lawful arrest performing a search of the person he is arresting and the passenger compartment of the car in which the arrestee was riding. In addition, the stop was conducted at night and two other individuals were in the car. Clearly, concerns for officer safety are an important consideration. . . . On the other hand, there is no evidence that Moore and the two passengers were anything but cooperative with the police officers at the scene. Moore immediately pulled the car over after Officer Zotz activated his lights and he put his hands up and out of the window so that Officer Zotz would not be concerned for his safety. He provided Officer Zotz with correct identification information and there is no indication that Moore resisted when ordered to step out of the car. Once the gun was found, Moore admitted that it belonged to him. During this time, Ms. Miller and J.J. sat on the sidewalk next to the car and waited until they were allowed to leave. A second officer was present at the scene and had control over Ms. Miller and J.J. so that they would not be a threat to Officer Zotz. Finally, Officer Zotz did not indicate that he was ever fearful for his safety. With these considerations in mind, we hold that the trial court did not err in concluding

that the concern for officer safety did not play a part in the search of the vehicle. . . . Further, the State's position is unsupported by the fact that Moore was placed under arrest because he committed the offense of driving while suspended and the initial stop was caused by his failure to signal a turn at an intersection. We see no facts which indicate that Officer Zotz needed to search the car in order to find and preserve evidence connected to the crime of driving while suspended, nor can we perceive of any such situation arising out of this charge. These circumstances, in addition to the facts that all parties were cooperative and Officer Zotz apparently lacked fear for his safety, lead to the conclusion that the search of the car was not reasonable under the totality of the circumstances present when the arrest was made.

796 N.E.2d at 770-71 (internal footnotes omitted). The trial court's order granting a motion to suppress the evidence of a handgun was affirmed.

[55] Here, Officer Lepsky pulled over a vehicle with improper plates in a high-crime area. It was late at night/early in the morning. He observed McAnalley make furtive movements toward the dashboard area of the vehicle on the passenger side. After Officer Lepsky received identification information regarding the three people in the vehicle, he learned that McAnalley had an outstanding felony warrant for his arrest. When back-up officers arrived, Officer Lepsky opened the passenger door of the vehicle and instructed McAnalley to exit the vehicle. McAnalley complied, he was told of the outstanding felony arrest warrant, was handcuffed, and was taken to the back of the vehicle. At that point, Officer Lepsky discovered an empty gun holster clipped to the waistband of McAnalley's pants that was covered by his shirt.

[56] While another officer monitored McAnalley, Officer Lepsky and Officer Coffing conducted a protective sweep of the car. Once the officers observed the handgun in the open glove compartment on the passenger side of the vehicle where McAnalley had been seated, they instructed the driver and other passenger to exit the vehicle. They complied and were taken away from the vehicle and not near McAnalley. Officer Lepskey *Mirandized* McAnalley, after which McAnalley admitted the handgun was his and that he should not have it in his possession. Officer Coffing then seized the weapon, secured it, and transported it for testing.

[57] In *Litchfield*, 824 N.E.2d at 361, our Supreme Court held that among other relevant considerations, the reasonableness of a search or seizure turns on a balance of the degree of concern, suspicion, or knowledge that a violation has occurred, the degree of intrusion imposed on the citizen's ordinary activities by the method of the search or seizure, and the extent of law enforcement needs. Here, there was a high degree of concern, suspicion, or knowledge that a violation had occurred and the intrusion upon McAnalley's activities was minimal. Further, unlike in *Moore*, where the defendant put both hands out of the window for officers to see, McAnalley made furtive movements toward the dashboard area of the vehicle. Furthermore, Moore did not have an outstanding felony arrest warrant at the time of his encounter with the police. Under the totality of the circumstances, we conclude that Officer Lepsky's and Officer Coffing's behavior was reasonable and did not violate the protections afforded under the Indiana Constitution.

# III. Stipulation of Prior Conviction

[58]    McAnalley contends that the trial court abused its discretion by instructing the jury on the specific nature of McAnalley's prior felony, and admitting evidence of the specific prior felony, when McAnalley had offered to stipulate to his status as a person who could not lawfully possess a firearm.

[59]    McAnalley initially was charged with multiple offenses. By the time of trial, however, McAnalley faced only the charge of Level 4 felony unlawful possession of a firearm by a serious violent felon and being an habitual offender. Clearly, the habitual offender status, to which McAnalley admitted, was a separate matter which was bifurcated from the main charge.

[60]    The issue is how the trial court treated McAnalley's proposed stipulation. McAnalley's proposals are listed above. Caselaw shows that on review, we have recognized that in jury trials for possession of a firearm by a serious violent felon, there is the potential for unfair prejudice against the defendant when the jury learns of the defendant's underlying criminal status. Analysis of the following cases helps explain the concerns.

[61]    In *Spearman*, officers responded to a report of an altercation. 744 N.E.2d at 546. When officers arrived at Hardin's mother's home, Hardin indicated that Spearman had brandished a gun and had then placed the gun in the trunk of the car in which he had arrived there. Spearman consented to a search of the vehicle, and law enforcement discovered the handgun.

[62]     Spearman was arrested.  He had a prior conviction for criminal confinement, so he was charged with unlawful possession of a firearm by a serious violent felon. A second charge, pointing a firearm at another person, was dismissed prior to trial.  Spearman moved for bifurcated proceedings, so the jury would not be aware of his prior conviction before determining whether he was in possession of a firearm.  The trial court denied the motion.  The trial court's denial was affirmed, because the prior conviction was essential to the determination of innocence or guilt.  744 N.E.2d at 547 (citing *Lawrence v. State*, 259 Ind. 306, 286 N.E.2d 830 (1972)).

[63]     Later, in *Hines v. State*, 794 N.E.2d 469 (Ind. Ct. App. 2003), a defendant was charged with a felony offense and a count of unlawful possession of a firearm by a serious violent felon.  The issue of bifurcation was revisited.  This defendant faced a robbery charge and a charge of unlawful possession of a firearm by a serious violent felon.  A trial court may bifurcate in this situation but does not appear to be required to do so.  On appeal, a panel of this court held that the trial court erred by denying the motion to bifurcate because it denied the defendant a fair trial.  *Id.* at 472 (*adopted and incorporated by Hines v. State*, 801 N.E.2d 634 (Ind. 2004)).

[64]     In *Williams v. State*, 834 N.E.2d 225, 228 (Ind. Ct. App. 2005), a panel of this Court held that

> we conclude the trial court here struck the proper balance
> between advising the jury that Williams had indeed been charged
> with a firearm-related crime and avoiding identifying Williams as

a "serious violent felon" from the outset of trial. Although current precedent does not require trial courts to bifurcate SVF trials, we believe that the bifurcation procedure serves the ends of justice in such trials and urge our state's trial judges to use this procedure in SVF cases.

[65] Next, in *Russell v. State*, 997 N.E.2d 351 (Ind. 2013), the defendant was charged with murder and Class B felony possession of a firearm by a serious violent felon based upon a previous conviction for robbery. Prior to trial, Russell requested a complete bifurcation of the murder charge and serious violent felon charge. Instead of completely bifurcating the trial on the two charges, the trial court partially bifurcated the trial, by instructing the jury to consider along with the murder charge whether the Russell had committed the non-existent offense of unlawful possession of a firearm. After the jury found Russell guilty of both "offenses," the trial court then instructed the jury to determine whether Russell was a serious violent felon. The jury convicted him of the charge and found that he was an habitual offender.

[66] On a petition to transfer, the Supreme Court held that, under the abuse of discretion standard, Russell was not prejudiced by the trial court's partial bifurcation. "One of the purposes of bifurcation is to keep prior convictions away from the jury in their initial determination of guilt for the substantive crime charged." *Id.* at 354 (citing *Hines*, 794 N.E.2d at 472 *adopted and incorporated by Hines v. State*, 801 N.E.2d 634 (Ind. 2004)).

[67] Bifurcation is not an issue here because McAnalley did not request bifurcation of the issues of possession of a handgun and his status as a serious violent felon;

thus the issue is not preserved for appeal. We include this caselaw analysis to help inform the bench and bar should this issue arise in another case.

[68] The main contention here is that McAnalley stipulated to his status as a felon who could not lawfully possess a handgun. In *Hardister v. State*, 849 N.E.2d 563 (Ind. 2006), our Supreme Court held as follows when discussing a similar situation:

> Where status as a felon is an element of the crime charged and the defendant stipulates to his status as a felon, admission into evidence of the full record of a defendant's prior felony conviction is an abuse of discretion under Indiana Rule of Evidence 403. *Sams v. State*, 688 N.E.2d 1323, 1325 (Ind. Ct. App. 1997), *trans. denied* (adopting the rule announced in *Old Chief v. United States*, 519 U.S. 172, 191-92, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997)). However, we find that any error committed by the trial court in disclosing the nature of Hardister's prior felony conviction was harmless. There was no other reference to the prior felony during the trial and therefore no substantial likelihood that the trial court's reference to the prior conviction materially influenced the verdict in view of the evidence supporting Hardister's conviction.

849 N.E.2d at 577.

The trial court read an instruction disclosing the nature and name of Hardister's prior conviction. Later, however, an instruction was given to the jury that comported with the stipulation agreed to by Hardister and the State. Thus, the single reference constituted harmless error.

[69]     McAnalley argues that the trial court's treatment of his stipulation is not harmless error because, unlike in *Hardister*, the State acknowledged that it would make a reference to the prior conviction in opening and closing arguments. Further, the instructions read to the jury included the name and nature of the underlying offense. Therefore, according to McAnalley, the jury heard about the robbery conviction at least four times: twice during instructions, during trial, and in closing argument.

[70]     Further, McAnalley argues that there was conflicting evidence about his constructive possession of the handgun. McAnalley claims that given the repeated references to his robbery conviction, the jury was likely unfairly influenced to believe that he and not someone else in the vehicle constructively possessed the handgun.

[71]     The State, on the other hand, argues that although the jury learned that McAnalley had a prior conviction for robbery, no evidence was introduced suggesting that he had used a handgun during the commission of the robbery. Further, the State argues that there was substantial independent evidence of McAnalley's guilt such that the admission of this evidence of the name of his conviction was harmless.

[72]     In *Ray v. State*, 846 N.E.2d 1064, 1070 (Ind. Ct. App. 2006), *trans. denied*, the references to the defendant's prior robbery conviction were limited at trial and the State was prohibited by the trial court from referring to the defendant as a

serious violent felon at trial. The defendant testified at trial to the facts of a robbery he had committed here and in Kansas. No reversible error was found.

[73] By contrast, in *McClain v. State*, 898 N.E.2d 409, 411-12 (Ind. Ct. App. 2008), the conviction was reversed and remanded because the trial court admitted the defendant's sex offender registry form after he had stipulated that he was a sex offender. Reversal was required because of the prejudicial impact of the admission of the details supporting his status. The panel cited the decision in *Sams v. State*, 688 N.E.2d 1323 (Ind. Ct. App. 1997), where the trial court's admission of the defendant's complete driving record was admitted despite the defendant's offer to stipulate that his license had been suspended for life.

[74] In *Old Chief v. U.S.*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), the defendant was charged with being a felon in possession of a firearm, using or carrying a firearm during the commission of a violent crime and assault with a dangerous weapon. The defendant offered to admit to the prior conviction element of the offense of being a felon in possession of a firearm. The Government refused to join in the stipulation and the district court agreed. The district court's decision was upheld by the Ninth Circuit Court of Appeals.

[75] The United States Supreme Court addressed whether a district court abuses its discretion when it refuses a defendant's offer to admit to the prior conviction element of the offense involving the defendant's legal status. The Court also considered whether evidence of the name and nature of a defendant's

conviction was admissible to show the prior felony conviction element of the offense of possession of a firearm by a felon.

[76]    Prior to trial, Old Chief had moved for an order requiring the Government "to refrain from mentioning–by reading the Indictment, during jury selection, in opening statement, or closing argument–and to refrain from offering into evidence or soliciting any testimony from any witness regarding the prior criminal convictions of the Defendant, *except* to state that the Defendant has been convicted of a crime punishable by imprisonment exceeding one (1) year." 519 U.S. at 174. He also tendered a proposed jury instruction reading as follows:

> The phrase 'crime punishable by imprisonment for a term exceeding one year' generally means a crime which is a felony. The phrase does not include any state offense classified by the laws of that state as a misdemeanor and punishable by term of imprisonment of two years or less and certain crimes concerning the regulation of business practices.
>
> [I] hereby instruct you that Defendant JOHNNY LYNN OLD CHIEF has been convicted of a crime punishable by imprisonment for a term exceeding one year.

*Id.* at 175-76.

[77]    The Ninth Circuit briefly addressed Old Chief's argument, stating as follows:

> Regardless of the defendant's offer to stipulate, the government is entitled to prove a prior felony offense through introduction of probative evidence. Under Ninth Circuit law, a stipulation is not

proof, and, thus, it has no place in the FRE 403 balancing process.

. . . .

Thus, we hold that the district court did not abuse its discretion by allowing the prosecution to introduce evidence of Old Chief's prior conviction to prove that element of the unlawful possession charge.

*Id.* at 177 (internal citations omitted).

[78] After granting Old Chief's petition for writ of certiorari, the Court held as a threshold matter that the name of the prior offense was relevant under Federal Rule of Evidence 401. *Id.* at 178-79. However, the Court held that the evidence may be inadmissible as unfairly prejudicial under a Federal Rule of Evidence 403[9] analysis. *Id.* at 179.

[79] Turning to what constitutes unfair prejudice and its application to Old Chief's appeal, the Court stated the following:

The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. So, the Committee Notes to 403 explain, "Unfair prejudice" within its context means an undue

---

[9] Indiana Rule of Evidence 403 is almost identical to the language of Federal Rule of Evidence 403. Indiana Rule of Evidence 403 does not use "wasting time" as one of the dangers of the admission of relevant but prejudicial evidence.

tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotion one.

Such improper grounds certainly include the one that Old Chief points to here: generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily). As then-Judge Breyer put it, "Although 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment– creates a prejudicial effect that outweighs ordinary relevance."

*Id.* at 180-81 (internal citations omitted).

[80] Next, the Court quoted from Justice Jackson's opinion in *Michelson v. State*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 218-19, 993 L. Ed 168 (1948).

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical

> experience that its disallowance tends to prevent confusion of
> issues, unfair surprise and undue prejudice.

*Old Chief*, 519 U.S. at 181.

[81] The Government's argument against agreeing to the stipulation was that it should be allowed to make its case the way it saw fit. The Court, however, held as follows: "This recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has however, virtually no application when the point at issue is a defendant's legal status, dependent on some judgment entered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 190. The Court also held as follows: "Although Old Chief's formal offer to stipulate was, strictly, to enter a formal agreement with the Government to be given to the jury, even without the Government's acceptance his proposal amounted to an offer to admit that the prior-conviction element was satisfied, and a defendant's admission is, of course, good evidence." *Id.* at 186.

[82] The judgment was reversed and the case was remanded to the Ninth Circuit Court of Appeals for further proceedings consistent with the United States Supreme Court's opinion.

[83] In the present case, the defendant did not request bifurcation of his trial. The trial court did, however, advise McAnalley as follows prior to trial:

> If during the proceeding, the defendant offers to stipulate to having the prior conviction as a B felony as a Robbery that that would be accepted.

Tr. Vol. 2, p. 45.

[84] At first, McAnalley offered to stipulate that he was a person who could not possess a firearm. However, he ultimately agreed to a stipulation that included the name of the prior conviction and the cause number. Further, the trial court's instructions followed those contained in the Indiana Pattern Criminal Jury Instructions and considered caselaw on the issue of how to treat McAnalley's legal status. Additionally, the trial court agreed to remove any reference to serious violent felon. But for the overwhelming evidence against McAnalley, it would have been reversible error not to have followed the United States Supreme Court's precedent on the issue. Because of the overwhelming nature of the evidence against McAnalley, we hold that the trial court did not abuse its discretion.

[85] However, we believe that better practice would be to follow the holdings in the United States Supreme Court opinion in *Old Chief*, and the Indiana Supreme Court opinion in *Russell*. *Russell* affirmed the trial court's partial bifurcation of the defendant's case to allow the jury to make the initial determinations of whether Russell had committed murder and whether he committed the non-existent offense of possessing the firearm. After phase one was complete and the jury found Russell to be in possession of the firearm, the jury was then asked to determine Russell's legal status as a serious violent felon and an

habitual offender.[10] The United States Supreme Court held in *Old Chief* the defendant's proposal amounted to an offer to admit that the prior-conviction element was satisfied, and a defendant's admission is, of course, good evidence. The district court should have accepted the proposal regardless of the Government's agreement.

## Conclusion

[86] We conclude that the admission of the handgun evidence did not violate McAnalley's federal or state constitutional protections. Further, the trial court did not abuse its discretion under the circumstances of this case. We offer guidance to the bench and bar as to what would constitute better practice in these situations.

Affirmed.

Baker, J., concurs

Bradford, J., concurs in result with opinion.

---

[10] One could argue that the matter should have been trifurcated, separating the serious violent felon status from the habitual offender status.

# IN THE
# COURT OF APPEALS OF INDIANA

Robert McAnalley,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

[Add Hand-down date]

Court of Appeals Case No.
18A-CR-1099

Appeal from the Marion Superior
Court

The Honorable Stanley Kroh,
Magistrate

Trial Court Cause No.
49G03-1711-F4-44873

**Bradford, Judge, concurs in result with opinion.**

[87] While I agree that the admission of the handgun evidence did not violate our federal or state constitutions and that it was harmless error for the trial court to instruct the jury about the nature of McAnalley's prior felony conviction, I respectfully disagree that bifurcation is a better or necessary practice in cases such as this.

[88] Because I do not believe that bifurcation, as used in *Russell*, is a better or necessary practice when a defendant is charged with Level 4 felony unlawful possession of a firearm by a serious violent felon ("SVF"), I respectfully concur in result.

[89] I agree with our decision in *Spearman v. State*, in which we concluded that where a defendant is only charged with SVF, as McAnalley was in this case, bifurcation of the proceedings is "not practical, or even possible[.]" 744 N.E.2d 545, 548 (Ind. Ct. App. 2001), *trans. denied*. We noted that "the legal status of the offender is an essential element of the crime, and the act—the possession— is illegal only if performed by one occupying that status." *Id*. Moreover, we reasoned that

> The court could not hold a guilt phase as to the possession of a firearm before holding a guilt phase regarding the existence of a prior conviction that constitutes a serious violent felony because, without more, one is not "guilty" of possession of a firearm. The court could not tell the jury that the defendant is charged with possessing a firearm because that in and of itself is insufficient to constitute a crime. In the absence of the serious violent felony conviction there is no *unlawful* possession component.

*Id.* Rather than conducting a bifurcated trial with a first phase regarding a possession charge that does not exist, a better practice is for the trial court to craft instructions and accept stipulations that minimize the potential for prejudice by stating "previously convicted of a felony enumerated under Indiana Code section 35-47-4-5" instead of explicitly naming the prior felony conviction or referring to it as a serious violent felony. *See id.* at 550 n.8 ("For example, trial courts may determine to reference the predicate felony as one 'enumerated under IC-35-47-4-5' rather than as a 'serious violent felony.'").

[90] Finally, I agree that a trial court should accept a defendant's stipulation to his status as a felon where it is an element of the crime. *See Hardister v. State*, 849

N.E.2d 563, 577 (Ind. 2006) (citing *Sams v. State*, 688 N.E.2d 1323, 1325 (Ind. Ct. App. 1997), *trans. denied* (adopting the rule announced in *Old Chief v. United States*, 519 U.S. 172, 191–92 (1997)) ("Where status as a felon is an element of the crime charged and the defendant stipulates to his status as a felon, admission into evidence of the full record of a defendant's prior felony conviction is an abuse of discretion under Indiana Rule of Evidence 403.")). However, in this case, that is not to what McAnalley offered to stipulate. McAnalley, through his counsel, was willing to agree to a stipulation being read to the jury that McAnalley is "a person who cannot have a gun lawfully." Tr. Vol. II p. 28. This stipulation, however, is not sufficient to establish that McAnalley is a serious violent felon, which is what the statute requires. There are plenty of Hoosiers who cannot lawfully have a gun, *e.g.*, certain individuals with a mental illness or a domestic-battery conviction, who are not serious violent felons. 18 U.S.C. § 922, Ind. Code § 35-47-2-1(c). Rather, what makes a person a serious violent felon is that he has committed a crime that has been deemed a serious violent felony under Indiana Code section 35-47-4-5, which is an essential element that the State must prove in cases involving an SVF charge. Therefore, should a defendant charged with SVF want to stipulate to his status as a serious violent felon without the jury hearing that he is a serious violent felon or the name of his prior felony conviction, it is a better practice for the language "previously convicted of a felony enumerated under Indiana Code section 35-47-4-5" to be used in the instructions and stipulations.

[91] Because I do not believe bifurcation is a better or necessary practice when a defendant is only charged with SVF, I respectfully concur in result.